UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

|  |  |  |
|---|---|---|
| ERIC S. CURL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-700 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On April 29, 2010, plaintiff filed his applications for DIB and SSI benefits.  (Page ID 187-200).  He alleged a March 1, 2008, onset of disability.  (Page ID 187, 194).

Plaintiff's claims for DIB and SSI benefits were denied on initial review.  (Page ID 97- 116).  On January 23, 2012, he received a hearing before an administrative law judge (ALJ), at which he was  represented by counsel.  (Page ID 55-95).  On February 24, 2012, the ALJ issued his decision finding that plaintiff was not disabled.  (Op., Page ID 39-48).  On May 24, 2013, the Appeals Council denied review (Page ID 30-32), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision.  Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

1.      The ALJ violated the treating physician rule when he failed to give controlling weight to the opinions of Occupational Therapist Barbara Rounds, which were later endorsed by Joel Bates, D.O., Brian Granger, D.O., and Keith Javery, D.O., and by not providing good reasons for the weight given to the opinions and not balancing the factors listed in 20 C.F.R. §§ 404.1527, 416.927.

2.      The ALJ committed reversible error by not including limitations on social functioning in plaintiff's RFC.

(Plf. Brief at 1, docket # 16, Page ID 796; *see also* Reply Brief, docket # 22, Page ID 823-26).  I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012);

*Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Sequential Analysis

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from March 1, 2008, through the date of the ALJ's decision. (Op. at 3, Page ID 41). Plaintiff had not engaged in substantial gainful activity on or after March 1, 2008. (*Id.*). Plaintiff had the following severe impairments: degenerative disc disease, gastroesophageal reflux disease, diabetes mellitus, attention deficit hyperactivity disorder (ADHD) and impulse control, anxiety, a personality disorder, obsessive compulsive disorder, and a pain disorder. (*Id.*). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (*Id.* at 5, Page ID 43). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing of ladders, ropes, and scaffolds; occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling; frequent balancing; sit/stand option allowing person to alternate between sitting or standing positions at 30 minute intervals throughout the day; and work limited to jobs composed of simple, routine, and repetitive tasks.

(Op. at 5, Page ID 43). The ALJ found that plaintiff's testimony regarding his subjective limitations was not fully credible. (*Id.* at 5-8, Page ID 43-46). Plaintiff could not perform any past relevant work. (*Id.* at 8, Page ID 46). Plaintiff was 25 years old as of the date of his alleged onset of disability and 29 years old on the date of the ALJ's decision. Thus, at all times relevant to his claims for DIB and SSI benefits, plaintiff

was classified as a younger individual.  (*Id.* at 9, Page ID 47).  Plaintiff has a marginal education and is able to communicate in English.  (*Id.*).

The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age with his RFC, education, and work experience, the VE testified that there were approximately 6,000 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing.  (Page ID 87-91).  The ALJ found that this constituted a significant number of jobs.  Using Rule 202.17 of the Medical-Vocational Guidelines as a framework, the ALJ found that plaintiff was not disabled.  (Op. at 9-10, Page ID 47-48).

### Discussion

### 1.

Plaintiff argues that the ALJ violated the treating physician rule by not giving controlling weight to the opinions of Occupational Therapist Barbara Rounds, which were later endorsed on a "check-box" form by Joel Bates, D.O., Brian Granger, D.O., and Keith Javery, D.O., and by not giving good reasons for the weight given to the opinions and not balancing the factors listed in 20 C.F.R. §§ 404.1527, 416.927.  Ms. Rounds conducted a consultative examination on December 12, 2011.  Nonetheless, she purported to opine regarding plaintiff's condition "since at least 3/1/08, " which also happens to be plaintiff's alleged onset of disability date.  (Page ID 769-777).  The ALJ found that Ms. Rounds's opinions were entitled to little weight.  The ALJ found that

the record did not support her suggested RFC limitations, nor did it support a March 2008 onset of disability:

> The evidence does not substantiate the March 1, 2008 onset date. The May 2008 x-ray of the lumbar spine was unremarkable (Ex 5F/76). The March 2009 MRI of the lumbar spine revealed lumbarization of S1, desiccation of the disc at L5-S1, and generalized bulging of the disc, and lateral protrusion on the right. Vertebral body height and alignment are otherwise normal (Ex 5F/74). Nevertheless, claimant went to emergency in August 2009 because he was working on the brake drum of a limousine when it compressed his left hand. Notably, the x-ray of the hand and forearm was negative for fracture (Ex 2F, 5F/71).

> Claimant completed physical therapy in April 2010 for low back pain, secondary to degenerative joint disease. He was on independent home exercise program. He could heel and toe walk. Straight leg raising was negative. Sensation was intact to light touch and pinprick through all dermatomes. Strength is 5/5 in all myotomes (Ex 4F/8). In January 2011, claimant denies weakness and fatigue (Ex 9F/29). However, in March 2011, claimant reports bending over exacerbated his back pain. The pain is alleviated by exercise, and trigger point injections. He had good response to last treatment. Moreover, he denied exercise intolerance, chest pain, shortness of breath, dyspnea, edema, palpitations, and syncope, chronic cough, wheezing, headaches, numbness, tingling, tremor, and weakness. He denies anxiety and depression (Ex 10F/3). In June 2011, during a complete physical he reported that he feels fine and has no complaints. His back pain improved significantly since physical therapy/occupational therapy and getting injection therapy. He is no longer on narcotics and lost some weight. He again denies fatigue and weakness. His gait is normal. In July 2011, claimant's worst complaint is arthralgia in hands based on difficulty with using a crescent wrench and opening mayonnaise jars. He denied any other large joint pains (Ex 9F, 10F, 11F).

> The physical functional capacity assessment performed on December 12, 2011, indicates that the claimant has extreme limitation. The evaluation was performed by an unknown occupational therapist who opines that the claimant does not appear physically capable of engaging in any work activity based on his physical and mental impairments. Since the claimant has not been forthright thus far, I find no reason to accept the opinion from a non-medical source (Ex 16F, 17F).

>Claimant's treating physician initially indicated that a formal functional capacity evaluation needed to be performed to complete a form (Ex 20F). However, Dr. Javery then indicated that he agrees with the December 2011 assessment. I afford minimal weight to Dr. Javery's and Dr. Bates' agreement with the limitations because they were not present during the evaluation and could not possibly evaluate the effort claimant used. Furthermore, there are no additional radiology tests to show claimant's condition is worse or better since the 2010 MRI, which clearly does not support the therapist's limitations or opinions (Ex. 18F, 19F, 4F). I would expect much more treatment or hospitalization given the degree of disability described in the Independent Medical Evaluation.

(Op. at 7-8, Page ID 45-46). The ALJ did not commit any error in the weight he gave Ms. Rounds's opinions.

The objective evidence did not support the extreme physical restrictions that she suggested. Plaintiff had no history of hospitalization for any mental impairment. Further, Ms. Rounds is a therapist. There is no "treating therapist" rule; accordingly, the opinion of a therapist is not entitled to any particular weight. *See Engelbrecht v. Commissioner*, 572 F. App'x 392, 397-98 (6th Cir. 2014). Therapists are not acceptable medical sources. *See* 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1). Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 2 (SSA

Aug. 9, 2006)).  The opinions of therapists fall within the category of information provided by "other sources."  *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).[1]

The social security regulations require that information from other sources be "considered."  2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1513, 416.913); *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007).  This is not a demanding standard. It was easily met here.  Further, the ALJ was not required to conduct a factor-by-factor in reviewing a treating physician's opinion, *see Garcia v. Commissioner*, No. 1:13-cv-501, 2015 WL 869191, at * 8 (W.D. Mich. Feb. 27, 2015), he certainly was not required to do so in addressing an "other source" opinion.  *See Belasco v. Commissioner*, No. 1:14-cv-1778, 2015 WL 4094707, at * 10 (N.D. Ohio July 7, 2015); *VanPortfliet v. Commissioner*, No. 1:10-cv-578, 2012 WL 1345315, at * 15 (W.D. Mich. Mar. 26, 2012).  I find no error.

The key question in this lawsuit is whether the ALJ gave adequate consideration to the signature pages that plaintiff's attorney obtained on a form in January 2012, in

---

[1]Plaintiff also includes Physician's Assistant Greene in the list of "treating physicians." (Plf. Brief at 5, 9, Page ID 800, 804).  This is inaccurate.  It is well established that physician's assistants are not "acceptable medical sources."  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); *Gardenhouse v. Commissioner*, No. 1:14-cv-96, 2015 WL 1458163, at * 9 (W.D. Mich. Mar. 30, 2015); *Cooper v. Commissioner*, No. 1:13-cv-1333, 2015 WL 685972, at * 6-7 (W.D. Mich. Feb. 18, 2015).  The treating physician rule did not apply to Mr. Greene's opinions. The opinions of physician's assistants fall within the category of information provided by "other sources."   20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). The ALJ considered Greene's opinions.  Mr. Greene and Dr. Javery signed the same form.  (Page ID 778).

an effort to transform Ms. Rounds's opinions into the opinions of treating physicians.[2]

The form at issue simply states:

> I agree with the limitations of function as described by Barbara Rounds, OTR in her Residual Functional Capacity Evaluation of Eric Curl dated 12/12/11.

(Page ID 778-79).  Signature spaces were provided to Dr. Javery and Dr. Bates.  Dr. Javery signed the form on January 5, 2012.  (Page ID 778).  Dr. Brian Granger signed the form on January 10, 2012, in the space provided for Bates's signature (Page ID 770), but made it clear that he would not join in any opinion regarding purported limitations stemming from any mental impairments.  (*Id*.).  There is no evidence in the record that Dr. Bates ever signed this form.[3]

---

[2]Where, as here, a physician simply "adopts" a therapist's opinion rather than offering his or her own opinion, "there arguably exists no treating physician opinion to which the [treating physician] standard even applies." *Belding v. Commissioner*, No. 1:13-cv-855, 2014 WL 5039443, at * 8 (W.D. Mich. Sept. 24, 2014) (Dr. Pullman adopting an opinion provided by Ms. Rounds).  ALJs are not bound by conclusory statements of doctors, particularly where they appear on "check-box forms" and are unsupported by explanations citing detailed objective criteria and documentation.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Hernandez v. Commissioner*, No. 1:14-cv-958, 2015 WL 3513863, at * 5 (W.D. Mich. June 4, 2015). "Form reports in which a doctor's obligation is only to check a box, without explanations of the doctor's medical conclusions are weak evidence at best." *Smith v. Commissioner*, No. 13-cv-12759, 2015 WL 899207, at * 14 (E.D. Mich. Mar. 3, 2015); *see also Ashley v. Commissioner*, No. 1:12-cv-1287, 2014 WL 1052357, at * 8 n.6 (W.D. Mich. Mar. 19, 2014) ("Courts have increasingly questioned the evidentiary value of 'multiple choice' or 'check-off' opinion forms by treating physicians[.]").

[3]Plaintiff's attorney represents to the court that Dr. Bates signed the form (Plf. Brief at 5, Page ID 800) (citing Tr. 726, found at Page ID 779), but the document in question (Page ID 779) is signed by Dr. Granger.

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. See 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance"[4] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial

---

[4] "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

evidence in the case record."' *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A treating physician's medical opinion is entitled to controlling weight where "two conditions are met: (1) the opinion 'is well supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d at 773. An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight, it should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling*

*Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff alleged a March 1, 2008, onset of disability. On May 20, 2008, x-rays of plaintiff's lumbar spine were "[u]nremarkable." "Four views of the lumbar spine demonstrate[d] normal alignment without disc space narrowing, fracture or subluxation." (Page ID 435). On September 2, 2008, plaintiff reported that he hurt his right wrist while working with concrete. (Page ID 407). On March 2, 2009, the MRI of plaintiff's lumbar spine showed some desiccation of the disc at L5-S1 and some bulging. (Page ID 319-20). On March 12, 2009, plaintiff was informed that his recent MRI showed no significant problems of note. There was some mild disc bulge at L5-S1, but it was not clinically significant. (Page ID 398).

On July 10, 2009, plaintiff appeared at Bethany Christian Services and was interviewed by Psychiatrist Henry Mulder, M.D. (Page ID 305-07). Plaintiff stated

-12-

that he was "employed as a carpet cleaner for a relative's company." (Page ID 305). Plaintiff reported that he had ADD and that he was anxious in social situations. He stated that he was easily distracted, but had a good driving record and was not overly messy or disorganized. Plaintiff appeared to be below average intelligence. His speech was normal. He was frequently distracted and kept looking out the window. His memory was grossly intact. Psychiatrist Mulder offered a diagnosis of social anxiety disorder, obsessive compulsive disorder, and ADD, combined type. He provided plaintiff with a prescription for Lexapro for the reported anxiety symptoms and indicated that he would likely add a prescription for Concerta to address plaintiff's ADD symptoms. (Page ID 306-07).

On August 8, 2009, plaintiff reported to doctors at Metro Health Hospital that he had injured his left hand while making repairs on a limousine. Doctors observed that plaintiff was a 26 year old man with an abrasion and mild tenderness, but there was no evidence of trauma. X-rays of plaintiff's hand and forearm were negative for fractures. (Page ID 313-15, 323-25). A subsequent CT scan of plaintiff's left wrist (Page ID 327-29) suggested a "nondisplaced fracture of the trapezium along its volar aspect." (Page ID 329). It was either a healing fracture or just a small cleft in the bone. (Page ID 330).

On September 10, 2009, plaintiff told Dr. Mulder that he was "off Lexapro" and stated that he did not find it particularly helpful with his social anxiety. (Page ID 308). Plaintiff failed to appear for his November appointment. (Page ID 310).

On November 9, 2009, plaintiff told Bonnie Taylor, M.D., that he had spilled gasoline on the cast that had been placed on his left wrist.  Plaintiff decided to remove the cast so that he could smoke cigarettes without blowing up.  He had been without the cast and his wrist had been without support for at least a week.  Plaintiff indicated that his wrist had been sore since he removed the cast.  (Page ID 374).  Dr. Taylor noted plaintiff's noncompliance, prescribed measures for plaintiff's comfort, and scheduled a CT scan to assess the healing progress that had been made before plaintiff removed  his cast.  (Page ID 375).

On December 3, 2009, plaintiff was examined by Margo Gregory, M.D.  (Page ID 370).  Plaintiff reported pain in his lower back and intermittent pain in his left leg.  Plaintiff no longer experienced wrist pain.  He reported no exercise intolerance.  His extremities showed no cyanosis or peripheral edema.  His gait was normal and he was oriented to place, person, and time.  Plaintiff's straight leg raising tests were negative.  Dr. Gregory prescribed Naproxen in response to plaintiff's pain complaints.  (Page ID 371).

On January 27, 2010, Stephen Bloom, D.O., conducted a consultative examination on a referral from J'Aimee Lippert, D.O.  (Page ID 351-54).  Plaintiff reported a history of intermitted low back pain.  (Page ID 351).  Dr. Bloom noted that the MRI taken of plaintiff's lumbosacral spine on March 2, 2009, showed some disc desiccation at L5-S1, with some bulging and partial lumbarization of S1, but there was no evidence of fracture.  Plaintiff reported that he had seen a surgeon at St. Mary's Hospital two weeks earlier, but the surgeon did not believe that any surgery was

indicated.  (Page ID 352).  Plaintiff continued to smoke a pack of cigarettes per day.  He stated that he was an unemployed janitor.  (Page ID 352).  Dr. Bloom found that plaintiff's gait and ambulation were intact.  Plaintiff was able to heel walk and toe walk bilaterally.  Plaintiff was generally deconditioned and displayed a reduced range of motion.  (Page ID 353).

On February 1, 2010, the MRI of plaintiff's lumbar spine revealed no fracture, subluxation, or significant loss of vertebral body height.  No abnormal marrow signal or cord signal was observed.  There was evidence of degenerative disc disease and mild broad based bulging at L5-S1.  (Page ID 331).  On February 15, 2010, Dr. Bloom found no electrodiagnostic evidence of lumbosacral radiculopathy, lumbar plexopathy, or focal mononeuropathy.  (Page ID 357).  On April 19, 2010, Dr. Bloom noted that plaintiff's movement had improved with physical therapy.  His straight leg raising tests were negative and his strength was 5/5.  (Page ID 358).

On August 5, 2010, plaintiff reported problems with acid reflux, cough, and some shortness of breath to Brian Granger, D.O.  (Page ID 472).  Plaintiff had no neurological weakness.  (Page ID 472).  Plaintiff was oriented and he was not in any acute distress.  (Page ID 473).  Dr. Granger refilled plaintiff's inhaler prescription and gave him a prescription for Prilosec.  When Dr. Granger suggested smoking cessation, plaintiff responded that he was "not interested."  (Page ID 476).  On September 15, 2010, Umpai Poopat, D.O., found that plaintiff's gait was normal and he was alert and oriented to person, place, and time.  His muscles showed no atrophy or deformity.  His extremities displayed no clubbing, cyanosis, or edema.  His asthma was moderate,

persistent, and poorly controlled.  (Page ID 485).  Plaintiff's condition improved.  On September 29, 2010, his asthma-related limitations were noted as "mild if any."  (Page ID 494).

On September 14, 2010, Psychologist Cynthia Raven conducted a consultative examination.  (Page ID 446-50).  Plaintiff complained that he suffered from "anxiety, Attention Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder, depression, and outbursts of anger."  (Page ID 446).  Plaintiff made no mention of his work as a carpet cleaner.  Instead he told the examiner that his last job had been in 2007 as a taxi driver and that he quit after being robbed.  (Page ID 450).  Plaintiff identified Joel Bates as his primary care physician.  (Page ID 446).  Plaintiff stated that he had never had any inpatient psychiatric treatment.  (Page ID 447).  He stated that he had been arrested for "retail fraud in the 3rd degree" in 2009.[5]  (Page ID 447).  Plaintiff continued to  smoke a pack of cigarettes per day.  He reported that he spent time "tinkering" with cars, watching television, and occasionally going fishing.  (Page ID 448).  Plaintiff typically did not get out of bed until 9 a.m.  He shared in all of the household chores with his wife.  Plaintiff was able to drive to his appointment and arrived on time.  He was oriented, alert, and spontaneous.  His speech was clear and coherent.  His thought processes were relevant, logical, and organized.  No unusual mental activity was noted.  Plaintiff denied delusions, hallucinations, feelings of persecution, or homicidal ideation.  (Page ID 448).  Plaintiff reported a history of

---

[5]Plaintiff testified that in 2010, he "got caught shoplifting" and had to pay restitution.  (Page ID 80).

anxiety and some depression.  (Page ID 449).  Psychologist Raven offered a diagnosis of attention deficit hyperactivity disorder, combined type, anxiety disorder, and traits of obsessive-compulsive personality disorder.  (Page ID 450).  The consultative examiner expressed her opinion that plaintiff's potential to be gainfully employed in a simple, unskilled work situation was guarded pending psychiatric treatment for symptoms of anxiety and depression.  (Page ID 450).

On October 8, 2010, plaintiff's wife called Metropolitan Hospital and indicated that someone working on her husband's disability claim wanted her to call and request a letter referring plaintiff "to either Family Outreach or Heartside regarding disability."  (Page ID 514).  Dr. Granger's response was:  "What is the patient's disability[?]  I do not recall him having one.  I need to know this before I send the referral." (Page ID 514).  Dr. Granger received a reply that plaintiff's attorney wanted plaintiff to receive counseling and needed the referral to get it.  Plaintiff's wife indicated that plaintiff was claiming disability based on mental impairments: obsessive compulsive disorder, ADD, and anxiety.  (Page ID 515).  Dr. Granger provided the requested referral.  (Page ID 516).

On December 13, 2010, plaintiff sought a refill of the medication for his back pain from Dr. Granger.  Plaintiff displayed no exercise intolerance and he had no shortness of breath.  Neurologically, plaintiff had no headaches, numbness, or weakness.  His strength was 5/5 and his gait was normal.  Dr. Granger once again emphasized that plaintiff should stop smoking.  He noted that it would help reduce plaintiff's back pain.  (Page ID 523).  On January 17, 2011, Dr. Granger indicated that

plaintiff's back pain was relieved by movement, Flexeril, and NSAIDs.  Plaintiff had no problems with weakness or fatigue.  (Page ID 535).  He was not in any respiratory distress.  His gait was normal and his reflexes were normal and symmetric.  Psychologically he was normal.  He was alert and oriented.  His thought content and affect were normal.  (Page ID 536).

On January 18, 2011, almost four years after his alleged onset of disability, plaintiff sought treatment at the Javery Pain Clinic.  The intake records indicate that plaintiff had no history or nerve blocks, surgery, use of a tens unit, or psychological therapy.  (Page ID 702).  Plaintiff reported that his back pain began only two years earlier when he "slid on some ice."  (Page ID 697).  Aaron Greene, a physician's assistant, was plaintiff's primary care provider at the Javery Clinic.  He performed a series of trigger point injections in repose to plaintiff's complaints of lower back pain.  (Page ID 652-56, 662-66, 669-673, 683-87, 690-93, 697-701).  Dr. Javery did see plaintiff on two occasions (April 8, 2011, and August 29, 2011), and on each occasion he administered epidural steroid injection.[6]  (Page ID 657-61, 680).  Dr. Javery generally

---

[6]Because Dr. Javery saw plaintiff on such a limited basis, the ALJ could have considered his opinion as the opinion of a consultative examiner rather than a treating physician without committing error.  *See Kornecky v. Commissioner*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[D]epending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."); *see also Smith v. Commissioner*, 482 F. 3d 873, 876 (6th Cir. 2007); *accord Mireles ex rel. S.M.M. v. Commissioner*, No. 14-2471, __ F. App'x __, 2015 WL 4503502, at * 2 (6th Cir. July 24, 2015) (finding that it was not error to classify an opinion as a consulting opinion where the physician had examined the claimant "no more than three times.").

found that plaintiff retained a normal range of motion in his spine[7] and extremities, and walked with a normal gait. (Page ID 659-60, 678-79).

The most recent records from the Javery Clinic are dated September 29, 2011. The physical examination records reveal that plaintiff was well-nourished, well developed, alert, and in no acute distress. His extremities displayed no evidence of edema or cyanosis. Plaintiff had normal muscle strength and a normal range of motion in his lower extremities. Physician's Assistant Greene indicated that plaintiff displayed some muscle spasm and a limited range of motion in his lumbosacral spine. Plaintiff's muscle tone was normal. His straight leg raising tests were negative bilaterally. Plaintiff's gait was normal and he was able to walk without difficulty. Plaintiff was oriented in all three spheres and his communication ability and articulation were normal. His mood was normal and his affect was appropriate. (Page ID 652-55). It was against this backdrop that the ALJ considered Dr. Javery's unexplained adoption of the functional restrictions suggested by Ms. Rounds. The ALJ observed that there was no objective x-ray or MRI test results suggesting that plaintiff's condition deteriorated. Further, he observed that Dr. Javery was not present on December 12, 2011, when plaintiff appeared before Ms. Rounds for the consultative examination. (Op. at 8, Page ID 46). I find that the ALJ provided good reasons for the weight he gave to Ms. Rounds's opinion that Dr. Javery adopted wholesale without

---

[7]On August 29, 2011, Dr. Javery did find that plaintiff displayed a "mildly" reduced range of motion in his lumbosacral spine. (Page ID 659).

providing any explanation or reference to any supporting evidence found in the treatment records of the Javery Clinic or objective test results.

Dr. Granger's progress notes document normal results. On January 17, 2011, he found that plaintiff's extremities displayed no clubbing, cyanosis, or edema. His reflexes were 2/4 bilaterally and his strength was 5/5 bilaterally. His gait was normal. He was alert, oriented, and displayed appropriate affect. His thought content was normal. (Page ID 535-37). On February 16, 2011, Dr. Granger indicated that plaintiff did not have any weakness or fatigue. He was alert, oriented, and displayed no anxiety, depression or psychosis. His strength was 5/5 bilaterally. (Page ID 546). On March 16, 2011, Dr. Granger found that plaintiff had no atrophy in his extremities. He had no clubbing, cyanosis, or edema. (Page ID 556). On May 12, 2011, Dr. Granger conducted another examination. Plaintiff reported that he felt fine and had no complaints. He reported that his back pain had improved significantly with physical and occupational therapy and treatment at the Javery Pain Clinic. In addition, plaintiff was no longer taking narcotics and he had lost some weight. (Page ID 568). Plaintiff had no exercise intolerance, no shortness of breath, no syncope, and no dyspnea. He had no weakness or fatigue. (Page ID 568). Plaintiff's gait remained normal. His strength was 5/5. (Page ID 569). On July 5, 2011, plaintiff complained of arthralgia in his hands. He complained that he was having some difficulty using a crescent wrench and opening mayonnaise jars. He had no other complaints or concerns. Other than some mild effusion, this examination returned normal results. (Page ID 608-09). Test results were "negative for rheumatoid arthritis and ana[.]"

(Page ID 611, 615).  On August 2, 2011, Dr. Granger noted that plaintiff continued to smoke tobacco despite his history of bronchitis and asthma.  Plaintiff was provided with medication and again advised to stop smoking.  (Page ID 635-36).  On August 16, 2011, Dr. Granger noted that plaintiff's bronchitis had resolved, but he continued to smoke cigarettes against medical advice.  (Page ID 715).  Dr. Granger indicated that he would only endorse the physical restrictions suggested by Ms. Rounds.  (Page ID 779).  The ALJ gave good reasons for giving little weight to the proffered restrictions. Dr. Granger was not present during the evaluation performed by Ms. Rounds and the objective evidence did not support the extreme restrictions suggested.  (Op. at 8, Page ID 46).

Plaintiff testified that Dr. Bates was his primary care physician.  (Page ID 82). Dr. Bates did not sign anything endorsing restrictions suggested by Ms. Rounds.  Dr. Bates did not sign the form provided by the attorney.[8]  (Page ID 779).

Plaintiff makes a related argument that the fact that Doctors Javery and Granger were not present during the consultative examination performed by Ms. Rounds was "irrelevant," and the "ALJ's reliance upon irrelevant facts demonstrates the failure to properly balance the *Wilson* factors."  (Plf. Brief at 13, Page ID 808).  This

---

[8]Plaintiff's attorney is at fault for any deficiency related to the ALJ's references to Dr. Bates in his opinion rather than Dr. Granger.  The signature space provided by plaintiff's attorney was for Dr. Bates.  (Page ID 779).  Plaintiff's counsel elected to proceed with Granger's marginally legible signature in the space provided for Dr. Bates rather than providing Dr. Granger with a corrected form for his signature.  Even if the ALJ made an error in attributing a signature to the wrong individual, it would not provide a basis for disturbing the ALJ's opinion.  *See Engebrecht*, 572 F. App'x at 399.

argument does not provide a basis for disturbing the Commissioner's decision.  It is pellucid that the lack of personal observation was not "irrelevant."  When plaintiff appeared before Ms. Rounds he displayed an antalgic gait and claimed that he typically walked with a cane:

> Gait: The client was noted to ambulate in a slow and guarded manner. His gait was moderately antalgic with decreased weight bearing on his left leg.  Though he typically walks with a cane he did not have the cane available during today's RFCE.  Per Eric, on 12/11/11 he experienced give-away weakness involving his left knee and fell, landing on and breaking his cane.

(Page ID 771).  There is no record of any medical treatment on or about the date plaintiff claims that he experienced give-away weakness and fell on his cane and broke it.[9]    Further, plaintiff's treatment records show that before this   medically undocumented fall, he walked with a normal gait and did not use a cane.  (*See, e.g.*, Page ID 353, 356, 371, 485, 569, 655, 665, 679, 700).  I find no basis for disturbing the Commissioner's decision denying plaintiff's claims for DIB and SSI benefits.

## 2.

Plaintiff argues that the ALJ relied on flawed vocational testimony.  (Plf. Brief at 14-15, Page ID 809-10; Reply Brief at 2-3, Page ID 824-25).  This argument is meritless.  The ALJ found that plaintiff retained the RFC for "simple, routine and repetitive tasks."  (Op. at 5, Page ID 43).  The ALJ's factual finding in this regard is supported by more than substantial evidence.  (Op. at 5-8, Page ID 43-46).  RFC is the

---

[9]On November 30, 2011, plaintiff displayed a limp.  (Page ID 763).  He attributed the limp  to "a herniated disc because of a 'slip on the ice' three years [earlier]."  (Page ID 763).

most, not the least, a claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *Harris v. Commissioner*, 598 F. App'x 355, 358 n.4 (6th Cir. 2015); *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007). A VE's testimony in response to a hypothetical question accurately reflecting a claimant's impairments provides substantial evidence supporting the Commissioner's decision. *See Varley v. Secretary of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). A hypothetical question is not required to list the claimant's medical conditions, but is only required to reflect the claimant's limitations. *Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004). The ALJ found that plaintiff's testimony was not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated complaints. *See Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Parks v. Social Security Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) ("Hypothetical questions [ ] need only incorporate those limitations which the ALJ has accepted as credible."); *Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010) ("[I]t is 'well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.'") (quoting *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). The hypothetical question the ALJ posed to the VE was accurate and the VE's testimony in response provides substantial evidence supporting the ALJ's decision.

Plaintiff's argument that the ALJ's hypothetical question to the VE was inadequate conflates the ALJ's findings at distinct stages of the sequential analysis,

ignores the ALJ's credibility determination, and disregards the more carefully calibrated nature of the ALJ's factual finding regarding his RFC.

The administrative finding whether a claimant meets or equals a listed impairment is made at step 3 of the sequential analysis. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Step-3 regulates a "narrow category of adjudicatory conduct." *Combs v. Commissioner*, 459 F.3d 640, 649 (6th Cir. 2006) (*en banc*). It "governs the organization and evaluation of proof of listed impairments that, if supported, renders entitlement to benefits a foregone conclusion." *Id.* "Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the [Social Security Administration's] SSA's special list of impairments, or that is at least equal in severity to those listed. The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. A person with such an impairment or an equivalent, consequently, necessarily satisfies that statutory definition of disability." *Id.* at 643 (internal citations omitted). It is well established that a claimant has the burden of demonstrating that he satisfies all the individual requirements of a listing. *See Elam*, 348 F.3d at 125. By contrast, the administrative finding of a claimant's RFC is made between steps 3 and 4 of the sequential analysis and it is applied at steps 4 and 5. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity. We use the residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ determined at step 3 of the sequential analysis that plaintiff's impairments did not meet or equal the requirements of any listed impairment. (Op. at 5, Page ID 43). Plaintiff's mental impairments did not come close to satisfying the demanding paragraph B severity requirements of listings:

> Claimant's mental disorders have been evaluated under Medical Listings 12.02, 12.04, 12.06, 12.08 (20 CFR, Part 404, Subpart P, Appendix 1). His disorders impose limitation on his ability to work and are severe within the meaning of the applicable regulations. Claimant has mild limitation in activities of daily living. He sits or reclines for comfort. He goes swimming as much as he can. He prepares meals, does laundry, shops, watches television, and does personal care (Ex 10E). Claimant has moderate limitation in social functioning. He avoids crowds. He gets along with family and authority figures (Ex 10E). Claimant has moderately impaired concentration, persistence or pace. He needs reminders to take medicine. He does not handle stress well. He does not follow spok[en] instructions but he can read recipes. He does not need reminders to do personal care. Claimant drives (Ex 10E). There have been no episodes of "extended" decompensation. He does not have a disease process resulting in such marginal adjustment that even a minimal increase in the mental demands or change in environment would predictably cause decompensation. He does not have a history of one or more years' inability to function outside of a highly supportive living arrangement.
>
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.

(Op. at 5, Page ID 43).

Plaintiff is not challenging the ALJ's step-3 finding that he did not meet or equal the requirements of a listed mental impairment. (Op. at 5, Page ID 43). Rather, he is attempting to take a portion of the ALJ's finding with regard to the paragraph B criteria at step 3 out of context and substitute it for the ALJ's factual finding that he retained the RFC for "simple, routine, and repetitive tasks." (*Id.*). As the ALJ noted,

the paragraph B criteria used at steps 2 and 3 of the sequential analysis "are not an RFC assessment." *See Policy Interpretation Ruling Titles II and XVI:  Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p (reprinted at 1996 WL 374184, at * 4 (SSA July 2, 1996)).  "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 or the Listings of Impairments." *Id.* at 4; *see Bordeaux v. Commissioner*, No. 3:12-cv-1213, 2013 WL 4773577, at * 12-13 (D. Or. Sept. 4, 2013); *Collier v. Commissioner*, No. 1:11-cv-1144, 2013 WL 4539631, at * 5-6 (W.D. Mich. Aug. 27, 2013); *Reynolds v. Commissioner*, No. 10-110, 2011 WL 3897793, at * 3 (E.D. Mich. Aug. 19, 2011); *Johnson v. Astrue*, No. 3:09-cv-492, 2010 WL 3894098, at * 8 (M.D. Fla. Sept. 30, 2010). The ALJ's findings at earlier steps in the sequential analysis do not undermine his findings that plaintiff retained the RFC for "jobs composed of simple, routine, and repetitive tasks."  (Op. at 5, Page ID 43).

### Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:  July 30, 2015                    /s/  Phillip J. Green
                                         United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).